# In the United States Court of Federal Claims

No. 24-955
(Filed: October 31, 2024)

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

TECH SYSTEMS, INC.,

        *Plaintiff*,

v.

THE UNITED STATES,

        *Defendant*,

and

WESTECH INTERNATIONAL, INC.,

        *Defendant-Intervenor*.

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

    *Stephanie D. Wilson*, McLean, VA, for the plaintiff. *Rachael C. Haley* and *Charles L. Bonani*, of counsel.

    *Augustus J. Golden*, Trial Attorney, United States Department of Justice, Commercial Litigation Branch, Washington, D.C., with whom were *Brian M. Boynton*, Principal Deputy Assistant Attorney General, *Patricia M. McCarthy*, Director, and *William J. Grimaldi*, Assistant Director for the defendant. *Lt. Col. Nolan T. Koon*, United States Army, of counsel.

    *Henry T. Whay*, McLean, VA, for the defendant-intervenor. *Ian A. Cronogue*, of counsel.

OPINION

BRUGGINK, *Judge.*

This is a bid protest by Tech Systems, Inc. ("TSI") of a procurement decision by the Army Contracting Command-Rock Island ("Army"). The disputed procurement centers on the provision of maintenance, supply, and transportation services to the Army's Schofield Barracks in Hawaii. The Army evaluated proposals submitted by bidders—TSI and Westech International, Inc. ("Westech")—in a three-step process. At the end of that process, the Army decided that Westech offered the lowest price technically acceptable and awarded the contract to Westech. TSI protested to the Government Accountability Office ("GAO"), which denied the protest. TSI then sued here. It argues that the Army acted arbitrarily and capriciously, violated federal acquisition regulations ("FAR"), and ignored the procurement solicitation's requirements. TSI moved for judgment on the administrative record, and the United States and Westech—which joined as a defendant-intervenor—cross moved for judgment on the administrative record. Oral argument was heard on October 24, 2024. As we explained at the conclusion of oral argument, and for the reasons set out herein, we deny plaintiff's motion and grant the United States' and Westech's cross-motions for judgment on the administrative record.

BACKGROUND

I.     The Solicitation

Located on O'ahu, the Schofield Army Barracks is home to the 25th Infantry Division and the 8th Theater Sustainment Command.   To support operations at Schofield, and other military installations in the Hawaiian Islands, the Army runs the Enhanced Acquisition Global Logistics Enterprise Basic Ordering Agreement ("EAGLE II BOA") program. The program connects the Army to contractors who, in turn, submit bids to provide logistical support to the Army.

As part of that program, the Army, in 2023, issued a solicitation (also known as "request for proposals" or "RFP") to EAGLE II BOA contractors asking for bids to provide logistical support at Schofield. The Army requested maintenance, supply, and transportation services. The anticipated contract would "result in a Cost Plus Fixed Fee (Firm Fixed Price Transition In and [program management office]) task order with 1, 12 month base

period, to include a 60 day transition period, 4, 1-year options, and 1, 6-month option period" "for a total of 5 years and 6 months if all options are exercised." AR 67.

The solicitation outlined a three-step process that the Army would use to award the contract. The solicitation called for the contract to be awarded to the offeror who offered a proposal with the lowest price technically acceptable. AR 127. Before the three-step evaluation process, the Army would perform a strict compliance review to ensure that proposals complied with the solicitation's basic guidelines. *Id.* From there, a pool of "five or 20%" of the compliant proposals would advance to the three-step evaluation. *Id.*

The three-step evaluation centered on three factors: technical acceptability, past performance, and cost/price. AR 67. At Step 1, the Army would rate proposals' technical quality as either acceptable or unacceptable. AR 128. Only proposals deemed acceptable would advance to Step 2. *Id.* Under Step 2, offerors could submit contract references demonstrating how their past work prepared them to fulfill the Schofield contract. AR 115. The Army would evaluate offerors' past performance "using a qualitative assessment by assigning confidence ratings." AR 128. Confidence ratings ranged from "substantial confidence" to "no" or "unknown" "confidence." AR 131–32. Finally, Step 3 required that the Army evaluate the offerors' proposed costs to see if they "were reasonable and realistic in accordance" with FAR 15.404-1. AR 132. The Army would then award the contract to the proposal with the lowest price technically acceptable.[1] AR 127.

At Step 1, the Army would evaluate proposals' technical acceptability. To be rated "acceptable," a technical proposal had to "clearly meet[]" the solicitation's "minimum requirements." AR 129. Offerors had to "demonstrate mission capability by detailing [their] proposed technical approach to meet the requirements specified in the [performance work statement] and this [solicitation]." AR 112. As part of the evaluation, the Army would scrutinize offerors' staffing and management plans ("SMPs"), organizational diagrams, and staffing and labor mixes to determine if the proposals were technically acceptable. AR 112–13. For the SMP, offerors would describe their staffing methodologies and labor categories by using the Service Contract Act ("SCA") and Collective Bargaining Agreement

---

[1] The Army also described the solicitation as "a competitive best value source selection." AR 128.

3

("CBA"). AR 112. For both SCA/CBA "non-exempt" and "exempt" positions in the staffing and labor mix, offerors' SMPs had to "include an adequate duty description for that position which will enable the Government to evaluate the skill set / skill level that is being proposed." *Id.* Along with the SMP, offerors were required to provide organizational diagrams and "proposed staffing mix/labor categories." AR 113. The organizational diagrams would "depict a comprehensive organizational overview" and identify offerors' and subcontractors' tasks. *Id.* Lastly, offerors would demonstrate an understanding of the solicitation's work requirements by proposing staffing and labor categories that would satisfy the project's personnel and workload requirements. *See id.*

At Step 2, offerors could submit past performance contract references. AR 115. The solicitation stated that "[t]he Government will consider the recent past performances that were provided with the Offeror's task order proposal in response to this [solicitation] as well as references obtained from sources other than those identified by the Offeror." *Id.* It clarified that offerors were "afforded the opportunity to provide past performance contract references for itself, Joint Venture Partner(s)[,] and for each proposed subcontractor[,] but it is not required to do so." *Id.* For joint venture references, the solicitation provided that offerors must include "a description of the relationship [with] the joint venture" and "a justification as to why the contractor can claim the past performance of work" "by explaining how the contractor will draw upon the past performance" with the joint venture. AR 116–17. Finally, offerors were required to link the tasks they had performed in earlier contracts with the Schofield tasks. *See* AR 117. The main Schofield tasks were maintenance, supply, and transportation. Each task, in turn, had its own subtasks. Maintenance had six subtasks, and supply and transportation each had eight subtasks. *See* AR 1359–86.

The solicitation vested the Army with broad discretion in weighing past performance references. For example, the Army was permitted—but not required—to consider: (1) the relationship between the offerors' past performance and the Schofield task requirements, (2) the offerors' or subcontractors' "overall percentage of participation for this task order requirement," and (3) past performance assessments. AR 130. Further, the Army could "consider the recency, relevancy, source and context of the past performance information it evaluates, as well as general trends in performance and demonstrated corrective action." *Id.*

4

Further, the solicitation outlined several criteria for evaluating whether past performance references were recent and relevant. The Army would consider a past performance relevant if it "involved [a] similar scope and magnitude of effort and complexit[y]" as the Schofield project. AR 131. Conversely, the Army would consider a past performance not relevant if it "involved little or none of the scope and magnitude of effort and complexit[y]" required by the solicitation. *Id.* Thus, a reference would only be relevant if it met the scope, magnitude, and complexity of the Schofield task order. *Id.* To be similar in scope, the Army would assess whether the contract reference "demonstrate[s] similar experience" to "at least one" of the task areas of maintenance, supply, and transportation. *Id.* To gauge whether a reference was similar in magnitude and complexity, the solicitation set a minimum average annual dollar value for references: $1.2 million for maintenance, $8.5 million for supply, and $10.4 million for transportation. *Id.* Based on its assessment of the contract references, the Army would then assign each offeror a confidence rating. *Id.*

Lastly, Step 3 required offerors (and their subcontractors) to provide direct and indirect labor rates data for the Army's cost-realism analysis. AR 121. For direct costs, offerors had to "provide the basis for proposed direct labor rates" and "supporting data for [d]irect [l]abor costs for" SCA/CBA "exempt positions." AR 122. Data in support of "exempt positions" had to show "how the supporting payroll data was used to calculate the proposed labor rates for each applicable labor category." *Id.* Similarly, offerors were required to provide "the pool and base costs" for "all proposed indirect expense rates," which included "overhead, general [and] administrative (G&A), and fringe benefit costs." *Id.* The solicitation warned that the "failure to adequately explain an inconsistency between promised performance and cost may result in a finding of [t]echnical [u]nacceptability or a finding that a proposed cost is unrealistic for the work to be performed." AR 128.

The Army cautioned offerors that it would have "concerns with the potential for post-award performance problems" if offerors "propose[d] unrealistically low costs." AR 132. Accordingly, the Army "reserve[d] the option of rejecting a proposal" if, in its judgment, an offeror's costs were "unrealistically low." *Id.* Likewise, if "[t]he magnitude of any necessary and appropriate Probable Cost adjustment[]" "[is] so substantial that [it] present[s] an unacceptable risk . . . the proposal may be rejected." *Id.* Separate from the unrealistic rates warning in Section M.5.3.2.1, Section M.5.3.3 clarified that, if indirect rates were "not fully supported," those rates

would be "capped at the [offeror's] proposed rates for evaluation purposes."
*Id.*

## II.    Proposals And The Army's Evaluation

The Army amended the solicitation and its attached documents six times before the solicitation closed on July 31, 2023.  AR 3825–26.  Three offerors timely submitted bids: Strategic Technology Institute, Inc. ("STI"), TSI, and Westech.  AR 3827.  After the strict compliance review, the Army eliminated STI from consideration as "non-compliant."  *Id.*  The Army then evaluated TSI and Westech under the three-step rubric outlined above.  *Id.*

First, the Army rated both Westech and TSI technically acceptable. AR 3827.  The Army rated Westech "acceptable" based on its SMP, organizational diagram, and its staffing and labor mix.  *Id.*  As to Westech's SMP, the Army concluded that Westech "adequately demonstrate[d] its ability to properly staff/organize the required effort."  AR 3711.  In doing so, the Army cited specific portions of Westech proposal and explained how Westech's SMP "demonstrate[ed] its efforts toward efficiency in management."  *Id.*  The Army also referenced exhibits, exact page ranges, and explained—section by section—how Westech met each of the solicitation's requirements.  *See* AR 3711–12.  Further, the Army found that Westech "provide[d] a comprehensive organizational overview" that addressed the solicitation's criteria, AR 3713, and "adequately propose[d] the required on-site" "labor categories," AR 3712.  Similarly, Westech "clearly identifie[d] itself as the prime, providing 54% of the workload, with the subcontractor (SA-Tech) providing 46% of the total work."  AR 3713. For its part, SA-Tech would perform in the maintenance and transportation areas, while Westech would "perform[] in the functional area of Supply, including the Ammunition Supply Point."  *Id.*

Additionally, the Army was comfortable with Westech's labor and staffing mix.  "Westech adequately addresses [solicitation] criteria . . . demonstrating an adequate understanding of the effort by providing appropriate staffing that is realistic and feasible to successfully perform all the [task] requirements."  AR 3716.  The Army observed that "[s]taffing levels support workload requirements" and that Westech's exhibit 9 "clearly illustrates customer interface at the different sections within this task order."  *Id.*  The Army also examined how Westech's exhibits 2 and 7 showed proper staffing and adequate man hours.  *Id.*  The Army cautioned, however, that five "[n]onexempt categories were not associated with a CBA

or SCA number," and, as a result, it was "unclear" what "specific duties" and "costs" were "associated with those positions."[2]  *Id.*  Still, the Army concluded that "this does not render Westech's Staffing & Labor Mix unacceptable."  *Id.*  In total, the Army conducted a seven-page analysis that analyzed how Westech met each element under Section M.5.1.2 and cited specific evidence from Westech's proposal to support its conclusions.  *See* 3711–17.

The Army performed a nearly identical technical evaluation of TSI's proposal.  *See* AR 3718–24.  It examined specific exhibits, compared TSI's proposed staffing to Schofield's requirements, and explained how TSI satisfied the solicitation's criteria.  *See id.*  The Army found that TSI's proposed staffing and organization were realistic for the Schofield project. AR 3723.  It also found that TSI proposed adequate oversight and quality control measures.  *Id.*  The Army concluded that TSI's proposal was "acceptable."  AR 3818.

Second, the Army rated Westech and TSI with "substantial confidence" in the past performance evaluation.  AR 3819.  For contract references, Westech provided two for itself (including one that was a joint venture) and three for SA-Tech (one of which was a joint venture).  AR 3751. TSI provided four contract references.  AR 3775.

The Army found that both of Westech's contract references (CR1 and CR2) were recent and relevant.  As to CR1, the Army analyzed the subtasks that Westech performed and found that the reference was recent and relevant because it demonstrated competency in six out of six maintenance tasks and four out of eight supply tasks, meaning that the "reference is similar in scope" to the Schofield tasks.  AR 3754–55.  The Army concluded that Westech's past performance with transportation tasks was not relevant because Westech established experience in only one out of the eight transportation tasks.  AR 3755.  Next, the Army found that Westech's joint venture contract reference (CR2) was recent and relevant given that it displayed experience in six out of the six maintenance tasks and four out of the eight supply tasks.  AR 3757. The Army again rated Westech's experience with transportation tasks not relevant as Westech only showed experience in one out of eight

---

[2] The five positions—whose costs and some SCA/CBA numbers were listed in Westech's cost proposal, see AR 3296—were: Engineering Technician II, Personnel Assistant III, Accountant, Purchasing Agent, and Administrative Assistant, AR 3158.

transportation tasks. *Id.* The Army noted that Westech, "as the managing member of the [Combined Technical Services joint venture]," "directed daily operations for the [joint venture]," which served as the basis for Westech being able to claim the past performance. AR 3756.

The Army also found SA-Tech's three contract references (CR3–CR5) to be recent and relevant. It judged CR3 to be recent and relevant because SA-Tech's experience in CR3 was "similar in scope" to Schofield's maintenance and transportation needs. AR 3758–59. The Army similarly found CR4 (a joint venture) to be recent and relevant because "contract effort[s] performed for this contract reference [are] similar in scope" to Schofield's maintenance, supply, and transportation requirements. AR 3760–61. Finally, the Army found CR5 recent and relevant for all three task areas. AR 3761–62.

The Army performed an equivalent analysis of TSI's past performance before awarding it a "substantial confidence" rating. AR 3775–83. The Army deemed that only one of TSI's contract references was recent and relevant. AR 3778–80. The other three were not relevant. AR 3777–78. The Army decided that TSI's one relevant contract reference was sufficient to merit a "substantial confidence" rating.

Third, the Army performed a cost-price evaluation for Westech's and TSI's proposals. AR 3820. The Army examined Westech's calculations, methodology, and hourly rate projections. AR 3790. For Westech's direct rates, the Army determined that Westech's SCA, CBA, and exempt labor rates were "realistic for this effort." *Id.* The Army, likewise, examined the historical and projected budgetary data provided by SA-Tech. AR 3794. The Army found that SA-Tech's proposed direct labor rates and fringe costs were realistic. AR 3794–95.

The Army also adjusted Westech's proposal and capped several of its proposed rates. Starting with the adjustment, Army evaluators discovered an omission in Westech's proposal: Westech had not factored in Hawaii's general excise tax that is assessed on all business activities. AR 3820. As a result, the Army adjusted Westech's proposal upwards by about $3.5 million (from $87,861,922.45 to $91,376,399.35) as "the most probable cost for this position." *Id.* The Army further found that, as to Westech's overhead rates, "[t]here is no historical rate data for the Labor Overhead rate since it was developed specifically for" the Schofield solicitation. AR 3791. "Since there was no historical data provided the analyst has no reference that the proposed

8

rates are accurate, thus these rates are not fully supported." *Id.* The analyst recommended capping the overhead rates for the entire period of performance per Section M.5.3.3. *Id.* Similarly, the Army capped Westech's G&A rates because they were "significantly lower than the historical rates" and "Westech did not provide supporting data," meaning that the rates were "unsupported." AR 3793. Likewise, the Army found SA-Tech's overhead and G&A rates to be unsupported because they were "significantly lower" than historical rates, and so capped them too. AR 3796–98.

Ultimately, the Army concluded that "the total evaluated price of $91,376,399.35 with the most [p]robable [c]ost [a]djustment and the recommendation of the capped rates is determined to be realistic for the work to be performed; reflect a clear understanding of the requirements; and the proposed cost elements are consistent with the methods of performance described in the technical proposal." AR 3801. The Source Selection Authority ("SSA") determined that "Westech's proposal[] [is] fair and reasonable and the costs realistic for the work being performed . . . ." AR 3828.

The Army performed a similar evaluation of TSI's cost-price proposal, which totaled $104,700,387.59. *See* AR 3808–14 (finding that TSI's rates were realistic). Because Westech's proposed, adjusted rate of $91,376,399.35 was lower than TSI's proposed rate of $104,700,387.59, the Army awarded Westech the contract on December 15, 2023. AR 3829, 3836.

III.    Procedural History

TSI protested the award at GAO. AR 3870–91. GAO dismissed the protest after the Army agreed to reexamine its evaluation of Westech's proposal and, if necessary, make a new award. AR 4292. The Army reviewed its evaluation and concluded that the original evaluation was correct. AR 4293–300. The SSA then reaffirmed the issuance of the task order to Westech. AR 3401–06. TSI again protested at GAO, and GAO denied TSI's protest. *See Tech Sys., Inc.*, B-421838.3, B-421838.4, 2024 WL 3052640 (Comp. Gen. June 4, 2024). GAO found that the Army provided a sufficient explanation for why Westech merited a "substantial confidence" rating on the past performance evaluation. *Id.* at *7–10. GAO further found the Army's cost-realism analysis to be reasonable because the Army did not find that any of Westech's rates were unrealistic. *Id.* at *12–14. This case followed.

DISCUSSION

I.    Standard of Review

The Tucker Act grants this court jurisdiction over bid protests. 18 U.S.C. § 1491(b)(1). In any bid protest, this court "review[s] [an] agency's decision pursuant" to the standards set forth in the Administrative Procedure Act ("APA"). § 1491(b)(4). Under the APA, we review an agency's action to see if it was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(1)(A); *see also Off. Design Grp. v. United States*, 951 F.3d 1366, 1371 (Fed. Cir. 2020). We may "set aside" a procurement decision as arbitrary or capricious if "(1) the procurement official's decision lacked a rational basis; or (2) the procurement procedure involved a violation of regulation or procedure." *Barbaricum, LLC v. United States*, 172 Fed. Cl. 186, 195 (2024) (quoting *Impresa Construzioni Geom. Domenico Garufi v. United States*, 238 F.3d 1324, 1332 (Fed. Cir. 2001)).

Our review of agency procurement decisions is highly deferential. *Id.* at 196. If the agency "provided a coherent and reasonable explanation of its exercise of discretion," we will not set aside its decision. *Mitchco Int'l, Inc. v. United States*, 26 F.4th 1373, 1384 (Fed. Cir. 2022) (quoting *Impresa*, 238 F.3d at 1333). To be sure, our review "is not a rubber stamp," *Great Lakes Dredge & Dock Co. v. United States*, 60 Fed. Cl. 350, 358 (2005), but we cannot substitute our judgment for that of the agency, *Barbaricum*, 172 Fed. Cl. at 196. Even if we may have reached a different conclusion than the agency, we cannot second guess the agency simply because "reasonable minds could" differ. *Safal Partners, LLC v. United States*, 171 Fed. Cl. 656, 665 (2024). In effect, a protester's "mere disagreement" with the agency's decision and rationale as to "the adequacy of the proposal" is insufficient to show an arbitrary or capricious act. *CRAssociates, Inc. v. United States*, 102 Fed. Cl. 698, 717–18 (2011), *aff'd*, 475 F. App'x 341 (Fed. Cir. 2012). A protester, consequently, "bears a 'heavy burden' of showing that the award decision had no rational basis." *Tumble Constr., Inc. v. United States*, 172 Fed. Cl. 43, 52 (2024) (quoting *Impresa*, 238 F.3d at 1333).

Here, TSI argues that the Army acted arbitrarily and capriciously at each step of the selection process. First, TSI argues that the Army did not provide enough detail when it analyzed the technical acceptability of Westech's proposal. Second, TSI asserts that the Army did not adequately explain why Westech's contract references were relevant. Third, TSI insists

that the Army did not provide sufficient explanation for why Westech's rates were realistic.

The United States responds that the Army appropriately exercised its discretion. First, the United States maintains that the technical evaluation was reasonable because the Army provided detailed findings, cited specific pages and exhibits, and analyzed how Westech would allocate workloads. Next, the United States argues that the Army's past performance evaluation was reasonable. Finally, the United States defends the Army's cost-price analysis because the Army complied with the solicitation.

Westech concurs that the Army's evaluation was reasonable. First, Westech agrees that the Army adequately documented its technical review of Westech's proposal. Second, Westech argues that TSI's objections to the Army's past performance evaluation are not based on the record, and it construes TSI's argument to be an objection to the terms of the solicitation, which it argues is untimely. Third, Westech argues that the Army properly documented its cost-realism assessment.

As we explain below in more detail, we agree with the United States and Westech. First, the Army adequately documented its technical evaluation and did not act arbitrarily or capriciously. Second, the Army's explanation for why Westech's contract references merited a "substantial confidence" rating was reasonable. Finally, the Army properly found that Westech's cost proposals were realistic.

II.    The Technical Evaluation Was Reasonable

TSI argues that the Army did not provide enough detail when it analyzed the technical acceptability of Westech's proposal or when it reevaluated the technical determination after TSI protested at GAO. TSI also contends that the Army was required to document why the presence of labor categories in Westech's proposal that were not reflected in the SCA/CBA did not render Westech's proposal unacceptable.

The United States responds that the technical evaluation was reasonable. The United States contends that the Army provided detailed findings, cited specific pages and exhibits, and analyzed how Westech would distribute workloads. As to the uncertain nonexempt SCA/CBA positions, the United States argues that nothing in the solicitation required the Army to

reject a proposal as technically unacceptable based on uncertainty. Westech echoes the United States' position on these points.

As part of our deference to agency procurement decisions, "[a]gency technical evaluations, in particular, should be afforded a greater deference by the reviewing court." *Benchmade Knife Co., Inc. v. United States*, 79 Fed. Cl. 731, 735 (2007). That is because agency technical ratings "involve discretionary determinations" that we "will not second guess." *Id.* (quoting *E.W. Bliss Co. v. United States*, 77 F.3d 445, 449 (Fed. Cir. 1996)). Granted, "[a] solicitation must state all significant factors and subfactors that the agency will consider in evaluating proposals." *Fulcra Worldwide, LLC v. United States*, 97 Fed. Cl. 523, 536 (2011). And "[e]valuators must base their decisions on these factors and subfactors." *Id.* But if the agency analyzes the factors required by the solicitation, we will defer to the agency's technical conclusions. *Red Cedar Harmonia, LLC v. United States*, 144 Fed. Cl. 11, 22 (2019).

Here, the Schofield solicitation granted the Army broad discretion in how it evaluated proposals' technical acceptability. For example, a proposal would be acceptable if it met the solicitation's "minimum requirements." AR 129. And when examining the SMP, organizational diagram, and staffing and labor mix, the Army gave itself the leeway to decide whether the proposals sufficiently demonstrated an understanding of the work to be performed. Although an offeror's failure to adequately explain an inconsistency between the promised performance and proposed cost could result in a finding of technical unacceptability, nothing in the solicitation required such a finding. *See* AR 128. Nor did the solicitation require the Army to provide detailed documentation or exhaustive analysis. *See* AR 129–30 (describing how the Army would perform the technical analysis).

The Army acted reasonably when it rated Westech's technical proposal "acceptable." The Army, for example, discussed pages 9–10 of Westech's SMP, "which provided sufficient detail of Westech's management and chain of command." AR 3711. It scrutinized exhibits 3's and 8's description of Westech's management authority. *Id.* And it examined Westech's on-site labor categories, labor hours, and how Westech "clearly identifie[d] itself as the prime providing 54% of the workload" with its subcontractor, SA-Tech, providing 46% of the workload. AR 3713. It further described which task areas SA-Tech and Westech would perform, Westech's quality assurance plan, and Westech's staffing levels (seen in exhibit 9), which "support workload requirements identified in the Staffing

& Labor Mix. . . . [and] clearly illustrate[] customer interface at the different sections within this task order." AR 3713–16. In doing all of this, the Army explained how specific pages, exhibits, and portions of Westech's proposal matched with specific solicitation requirements. *See* AR 3711–16. In sum, the Army provided ample documentation explaining how Westech's proposal aligned with the solicitation.[3]

Further, any defect in Westech's proposal due to the five nonexempt labor categories is immaterial. A condition is immaterial "when the effect on price, quantity, quality, or delivery is negligible when contrasted with the total cost or scope or the supplies or services being acquired." *See Oak Grove Techs., LLC v. United States*, 116 F.4th 1364, 1379 (Fed. Cir. 2024) (quoting 48 C.F.R. § 14.405). Here, Westech's failure to provide duties and costs for five SCA/CBA nonexempt positions in its technical proposal was immaterial. First, only five positions—out of 102—lacked duty and cost descriptions. *See* AR 3158. Second, Westech provided the costs for those five positions in its cost proposal, and the Army (in its cost-realism analysis) found that those positions matched with SCA/CBA positions. AR 3296, 3790. Third, the solicitation explicitly vested the Army with discretion in how to address technical uncertainties. AR 128 (stating that a proposal "may"—not must—be rejected for technical uncertainty); *see also ITellect, LLC v. United States*, No. 24-935, 2024 WL 4533171, at *10 (Fed. Cl. Oct. 21, 2024) ("While the use of the permissive 'may' does not confer plenary discretion to the contracting officer, in the absence of any prescribed standards . . . the government's discretion is at its apex.").

Hence, the Army did not have to reject the proposal merely because Westech did not list costs and duties for five positions. And contrary to TSI's assertion that the Army had to provide a detailed explanation for why the defect did not render Westech's proposal unacceptable, nothing in the solicitation required the Army to do so. *Cf. Oak Grove*, 116 F.4th at 1380 (explaining that when a solicitation "does not mandate exclusion from the bid process of an offeror who fails to include" nonmaterial information, a "contract officer [is] under no obligation to provide written reasons for why he was not troubled by the lack of inclusion of such" information).

As it is, the Army provided sufficient documentation. It acknowledged the problem and said that the defect did not necessitate a

---

[3] And as the United States points out, the Army's evaluation of TSI's proposal mirrors its evaluation of Westech's proposal. Def.'s Reply 18.

13

finding of uncertainty. AR 3716. Considering the technical review's overall thoroughness, the Army's determination was reasonable because uncertainty with just five of Westech's labor categories did not make the entire proposal technically unacceptable.

Put simply, the Army went through the solicitation's requirements—subsection by subsection—and explained how Westech's proposal matched the solicitation's criteria. Neither the solicitation nor FAR mandated more.

TSI's counterarguments are unavailing. First, TSI alleges that the Army's reevaluation provided insufficient documentation. But the solicitation never mandated detailed documentation for the initial examination, much less the reevaluation. Second, TSI argues that the Army did not provide enough detail when it concluded that Westech's SMP and labor mix were adequate. Yet, as noted, the Army provided six pages of analysis describing how Westech's proposal followed the solicitation. *See* AR 3711–16. Given that the solicitation did not set a minimum level of documentation, TSI's objection to the adequacy of the evaluation is insufficient to meet its heavy burden under the APA. *CRAssociates*, 102 Fed. Cl. at 717–18.

TSI's argument that the Army abused its discretion as to Westech's nonexempt categories is similarly without merit. As noted, the Army highlighted that some of Westech's "[n]onexempt categories were not associated with a CBA or SCA number," so it was "unclear" what "specific duties" and "costs" were "associated with those positions." AR 3716. Still, the Army concluded that "this does not render Westech's Staffing & Labor Mix unacceptable." TSI argues that the Army had to provide more explanation, given that "an inconsistency between promised performance and cost may result in a finding" of technical unacceptability. AR 128. But as explained above, the solicitation merely says that an inconsistency "may" negatively impact an offeror's evaluation, meaning that the Army's discretion was at its "apex." *ITellect*, 2024 WL 4533171, at *10. And the Army did not have to provide a written explanation for why it was not concerned by the immaterial defect in Westech's proposal. *Oak Grove*, 116 F.4th at 1380. Further, we are unconcerned given the agency's overall consideration that Westech's proposed staffing was adequate. TSI, therefore, has not revealed any errors that merit displacing the Army's decision.

14

III.    The Past Performance Analysis Was Not Arbitrary Or Capricious

TSI next challenges the Army's past performance evaluation.  It argues that the Army inadequately explained why Westech's joint venture contract references were relevant, given that Westech did not describe in detail how tasks were divided within the joint venture.  TSI, moreover, complains that Westech's references showed experience in "only" "four of the eight Supply tasks," meaning that the Army had to explain why Westech could fulfill the Schofield requirements when it had experience in only four of the eight supply tasks. TSI MJAR 23.  TSI further contends that the Army improperly considered SA-Tech as supporting supply tasks when its proposed supply tasks were not ones requested in the solicitation.  TSI additionally alleges that the Army violated FAR by allowing Westech to perform only 54% of the supply tasks while SA-Tech performed the rest of the contract.

The United States responds that the Army's past performance evaluation was reasonable.  The United States reasons that, because the solicitation did not require painstaking detail, the Army could exercise its discretion in evaluating whether past performances were relevant.  Nor, according to the United States, were Westech and SA-Tech required to provide a detailed breakdown of how work was assigned within their respective joint ventures.  In addition, the United States claims that TSI misreads the Army's evaluation to say Westech would only perform 54% of the supply tasks when Westech would perform 54% of the total contract through its work on the supply tasks.  Westech adds that TSI's objections to the Army's past performance evaluation are not based on the record, and it construes TSI's argument to be an objection to the terms of the solicitation, which it argues is untimely.

We give "the greatest deference possible . . . to the agency" when reviewing an agency's past performance analysis.  *Dynamic Sys. Tech., Inc. v. United States*, 127 Fed. Cl. 551, 562 (2016) (quoting *Sci. & Mgmt. Res., Inc. v. United States*, 117 Fed. Cl. 54, 65 (2014)).  Our role is merely to review the past performance rating to ensure it was reasonable and consistent with the solicitation's criteria and applicable law.  *Glenn Def. Marine (Asia), PTE Ltd. v. United States*, 105 Fed. Cl. 541, 564 (2012), *aff'd*, 720 F.3d 901 (Fed. Cir. 2013).  The merits of offerors' past performance are for the agency, given its specialized expertise.  *Garrett Elecs., Inc. v. United States*, 163 Fed. Cl. 632, 666 (2023).  As a result, what constitutes a relevant past performance

15

is within the agency's discretion. *PlanetSpace, Inc. v. United States*, 92 Fed. Cl. 520, 539 (2010).

Like the technical factor, the solicitation granted the Army significant discretion in how it appraised TSI's and Westech's past performance references. For example, the Army could consider the maintenance, transportation, and supply tasks that offerors and their subcontractors previously performed and how those experiences related to the Schofield project. AR 130. The Army, likewise, could "consider the recency, relevancy, source and context of the past performance information it evaluates, as well as general trends in performance and demonstrated corrective action," as well as the offerors' and subcontractors' overall percentage of participation in the Schofield task order. *Id.* The solicitation, then, gave the Army leeway in evaluating whether a given past performance was relevant. Aside from setting monetary minimums to ensure that past performances were of like magnitude and complexity, the only hard parameter for relevancy was that an offeror had to demonstrate relevant experience in at least one of the three main task areas. *See* AR 131. In short, the solicitation gave the Army broad discretion in how it elevated past performances, and the Army exercised that discretion to conclude that Westech's past performances were relevant.

The Army's past performance examination was reasonable. Westech submitted five contract references: two for itself and three for its subcontractor, SA-Tech. Two of those involved joint ventures. For Westech's references, the Army determined that they were relevant as they showed experience "similar in scope" to the maintenance and supply tasks, with Westech having established experience in six out of six maintenance tasks and four out of eight supply tasks. AR 3755, 3757. In doing so, the Army documented the particular work Westech had performed for each subtask before concluding that Westech's past experience was similar in scope. *See* AR 3754–57. Added evidence that the Army did not perfunctorily peruse Westech's proposal is that it found that Westech did not have relevant experience in the transportation task area because Westech only had experience in one of eight transportation tasks. AR 3755, 3757. The Army further found that Westech's experience with the joint venture was relevant because Westech was the joint venture's "managing member" and "directed" the venture's "daily operations." AR 3756. Granted, the Army could have said more about what work Westech performed in joint venture. Yet it stands to reason that Westech, by directing and managing the joint venture's daily operations, would have familiarity with every aspect of the

16

joint venture's work.  So the Army's conclusion that Westech could claim the joint venture experience was reasonable.

Further, the Army's evaluation of SA-Tech's three contract references complied with the solicitation.  The Army found SA-Tech's first contract reference to be recent and relevant to the maintenance and supply task areas.  AR 3758–59.  The Army also decided that SA-Tech's second reference, a joint venture with Southwest Range Services, was recent and relevant showed experience similar to Schofield's needs for maintenance, supply, and transportation support.  AR 3760–61.  Finally, the Army decided that SA-Tech's final reference was recent and relevant for all three task areas.  AR 3761–62.  Although Westech had proposed that SA-Tech would perform only two supply tasks—"Modernization, Displacement, and Repair Site" and "PTA Support"—the Army found that SA-Tech had proven experience in areas directly related to the Schofield solicitation, including in the ammunition supply services.  AR 3154, 3760.  In total, the Army examined each contract reference, determined whether the past performance demonstrated therein was similar in scope, magnitude, and complexity to the Schofield project, and assigned Westech a rating.  Given that, the Army followed the solicitation by exercising its judgment and discretion to decide what references were relevant.

TSI's arguments that the Army acted arbitrarily and capriciously are unpersuasive.  TSI alleges that Westech did not provide adequate information on how its joint venture references were relevant to the solicitation's requirements, given that it did not detail how tasks were divided within the joint venture.  Because Westech did not provide that information, TSI reasons, the Army had no basis to find that those contract references were relevant.  That is incorrect.  TSI conflates what information Westech had to provide in Section L with the discretion vested to the Army in evaluating that information in Section M.  And, although TSI asserts that the Army's finding that Westech and SA-Tech were managing members that directed daily operations was too conclusory to be reasonable, the Army did not have to provide more analysis.  To be sure, Westech could perhaps have provided more information on how it divided work with its joint venture partner, and the Army, in turn, could have been clearer in its description of Westech's joint venture relationship.  But even if we were inclined to reach a different conclusion, TSI must show more than simply that reasonable minds might differ.  *See Safal Partners*, 171 Fed. Cl. at 665.  It has not.

TSI likewise protests that Westech's first and second contract references showed experience in only "four of the eight Supply tasks." TSI MJAR 21–22. TSI emphasizes that Westech had no experience in the ammunition supply services category. Based on that, TSI argues that "the record is devoid of *any* analysis by the Army explaining why satisfying only four out of eight Supply tasks justified a conclusion these contract references were similar in scope to the Supply functional area." TSI MJAR 23.

Again, TSI reads requirements into the solicitation that are not there. Although Section M.5.2.1 states that the Army would "assess the contract references" "against the past performance evaluation criteria," it goes on to grant the Army discretion in how it weighed contract references' relevancy. *See* AR 130. The solicitation, therefore, contemplated that the Army could exercise discretion in evaluating how Westech's and SA-Tech's past performances related to the Schofield task requirements, their "overall percentage of participation" in the task order, and their past performance questionnaires. *Id.* Similarly, the Army had discretion to evaluate how Westech and TSI "compl[ied]" with prior "contractual agreement[s]," "use information from other sources," and "consider the recency, relevancy, source, and context of past performance information." *Id.*

The Army appropriately analyzed the recency and relevancy of Westech's contract references. As explained, it documented the exact work that Westech performed in specific subtasks. AR 3754–57. Based on that examination, the Army decided that competency in four out of eight supply tasks and six out of six maintenance tasks rendered the past performances relevant. *See id.* The solicitation's only brightline requirement to find a reference relevant was that offerors had to prove experience in at least one task area. AR 131. Westech established experience in two. Moreover, in TSI's briefing and at oral argument, TSI could not explain how many supply subtasks Westech should have had experience in if four out of eight is insufficient. Although TSI emphasizes that Westech had no experience in the Ammunition Supply Services subtask, the solicitation did not require offerors to have experience in specific subtasks. In short, TSI's objections have no basis in the solicitation.

TSI also contends that the Army improperly found substantial confidence in Westech by using SA-Tech's supply experience to fill holes in Westech's supply experience. TSI additionally points out that SA-Tech's proposed supply subtasks are not in the task order. It also alleges that

Westech violated FAR regulations by assigning more work to its subcontractor, SA-Tech, than to itself.

Although Westech's proposal—and the Army's evaluation—are less than ideally clear on what role SA-Tech would play in fulfilling the supply task, TSI is incorrect that the Army improperly considered SA-Tech's supply experience. To start, TSI seems to argue that the Army could only assess the relevancy of Westech's and SA-Tech's contract references based on what tasks Westech and SA-Tech would perform for the Schofield project. That is incorrect. The solicitation contemplated a global past performance review, which included evaluating the offerors' experience in areas where they would not be performing. *See* AR 130. For example, Westech said it would only perform in the supply task area. AR 3154. Even so, the Army evaluated Westech's experience in maintenance and transportation. So too with SA-Tech. The Army investigated SA-Tech's supply experience, not to fill any alleged gaps in Westech's experience, but simply as part of the wholistic review encouraged by the solicitation.

In addition, there was no "gap" for SA-Tech to fill. The Army never said that Westech's lack of experience in four supply subtasks constituted a "gap," nor did it suggest that it was relying on SA-Tech to fill any such shortfall. Thus, TSI is wrong that the Army improperly used SA-Tech's supply experience to patch holes in Westech's proposal because (1) there were no holes and (2) the solicitation allowed the Army to assess SA-Tech's supply experience.

TSI's other argument on this point—that the Army incorrectly relied on SA-Tech to provide supply services not requested by the solicitation—is mistaken too. True, Westech confusingly promised to cover the solicitation's supply tasks while also saying that SA-Tech would perform two supply tasks not listed in the performance work statement. *Compare* AR 3154, *with* 1366–78 (listing the eight supply tasks). But the most natural reading of Westech's proposal suggests that Westech offered SA-Tech's other two supply areas in addition to what the solicitation contemplated. Nothing in FAR or the solicitation prohibited Westech from doing so. More importantly, even if the Army mistakenly thought SA-Tech would provide some services in the supply area, the fact remains that Westech had "considerable experience in the areas of Maintenance and Supply," glowing contract reviews for its "exceptional performance," and would perform 54% of the contract's total value in the supply area. AR 3770. In effect, even if

the Army had discounted SA-Tech's supply experience, nothing in the record suggests that the Army's confidence in Westech would have diminished.

TSI's allegation that Westech violated the FAR's work allocation requirements is likewise misplaced. Admittedly, there is some confusion on this point. The Army—in Westech's past performance evaluation—states that Westech "has proposed itself for 54% of performance for Supply" and "SA-Tech for 46% of performance for all functional areas." AR 3770. The GAO read that to mean Westech would only perform 54% of supply tasks, rather than 54% of the total contract, thereby leaving SA-Tech to perform 46% of the supply tasks and all remaining maintenance and transportation tasks. *See* AR 4514 n.7. That reading does not accord with Westech's proposal. *See* AR 3153 (Westech "will provide support for the Supply task area," and "SA-Tech will be subcontracted to support" maintenance and transportation); *id.* at 3274–76 (detailing that the value of the supply task— which Westech would perform—exceeded the combined value of the maintenance and transportation tasks). Nor does it square with the Army's other statements. *See* AR 3750 (Westech "proposed for itself 54% of performance between the functional area of Supply" while SA-Tech would perform the remaining 46% of the contract in maintenance, supply, and transportation). Thus, although the Army's documentation could have been clearer, the fact remains that Westech promised to perform tasks equal to 54% of the contract's total value, in compliance with FAR. FAR § 52.219.14(e) (contractors "will not pay more than 50[%] [] of the amount paid by the Government for contract performance to subcontractors"). Any confusion generated by the Army, then, is insignificant and did not prejudice TSI. *See Advanced Data Concepts, Inc. v. United States*, 216 F.3d 1054, 1057 (Fed. Cir. 2000) (an agency error must be not just "significant" but "prejudicial").

IV.    The Army Appropriately Determined that Westech's Proposed Costs Were Realistic

TSI insists that the Army's cost-price analysis was arbitrary and capricious. TSI argues that the Army did not provide sufficient documentation and reasoning as to why Westech's rates were realistic. It further contends that the Army failed to declare Westech's and SA-Tech's overhead and G&A rates to be realistic. It repeats its argument that the cost uncertainty of Westech's SCA/CBA nonexempt positions rendered the cost-realism analysis unreasonable. TSI also avers that the Army was required to perform a risk assessment after it capped Westech's and SA-Tech's

unsupported indirect rates.  Finally, it argues that the Army's cost-realism evaluation was unreasonable because it ignored the fact that Westech would operate at a loss on the contract.

The United States defends the Army's cost-price analysis by arguing that TSI is again reading requirements into the solicitation that are not there and that the Army properly documented its analysis.  As to the capped rates, the United States reasons that the Army would not propose an unrealistic capped rate; therefore, the capped rates the Army proposed were realistic. Relatedly, the Army did not need to perform a risk assessment because Westech's rates were merely unsupported, not unrealistic.  Lastly, the Army contends that Westech assumed the risk of operating at any loss on the contract.  Westech, for its part, alleges that TSI's risk assessment argument is a challenge to the solicitation's terms and untimely.

Our cost-realism review is narrow.  We examine whether the agency's price-realism analysis was rational and consistent with the solicitation's criteria. *Ala. Aircraft Indus., Inc.-Birmingham v. United States*, 586 F.3d 1372, 1375–76 (Fed. Cir. 2009); *Halter Marine, Inc. v. United States*, 56 Fed. Cl. 144, 172 (2003).  An agency's cost-realism analysis is rational so long as it considered available information and did not make "irrational assumptions" or "critical miscalculations." *Fulcra Worldwide*, 97 Fed. Cl. at 539.  The agency need not have conducted the cost-realism review with "impeccable vigor." *Halter Marine*, 56 Fed. Cl. at 172.

The Army's cost-realism analysis of Westech's proposal was rational. In its nineteen-page cost-realism report, the Army thoroughly documented the substance of Westech's proposal and the facts that underpinned Westech's expected costs.  *See* AR 3784–802.  For direct rates, the Army discussed Westech's and SA-Tech's SCA/CBA labor rates, direct labor hours, and cost methodology.  AR 3789, 3794.  The Army similarly assessed Westech's and SA-Tech's indirect rates by describing, for example, health insurance costs, cafeteria plans, how many seats would be purchased, travel expenses, paid vacations, and utility budgets.  *See* AR 3790–03, 3795–07. Based on those exact details, the Army concluded that Westech's and SA-Tech's direct and fringe labor costs were realistic.  AR 3790, 3794–95.

True, the Army capped some rates as "unsupported"—but it also found those capped rates to be realistic.  AR 3801.  As to Westech's overhead and G&A rates, the Army found that those rates were unsupported by historical rates data and recommended capping them.  AR 3791–92.  The

Army similarly capped SA-Tech's overhead and G&A rates because they were unsupported. AR 3796–98. The Army then affirmatively determined in the cost-realism report's summary that the total evaluated price with the excise tax adjustment and "the recommendation of the capped rates is determined to be realistic for the work to be performed . . . ." AR 3801. As a result, the Army complied with the solicitation's requirement that it "evalut[e] specific elements of proposed cost elements" to decide if the proposed "cost elements are realistic for the work to be performed." AR 132. Stated succinctly, the Army considered the available information and did not indulge in "irrational assumptions" or commit "critical miscalculations." *Fulcra Worldwide*, 97 Fed. Cl. at 539.

TSI's objections are unpersuasive. To start, TSI complains that the Army did not evaluate the cost realism for each of the three task areas. Yet nothing in the solicitation required such an analysis, nor did the Army perform any such evaluation for TSI's proposal. Even so, TSI insists the Army had to do more than conclude that Westech's direct rates were "determined" to be "realistic." TSI MJAR 28 (quoting AR 3790, 3794). But the Army provided the basis for its determination by cataloguing Westech's proposed costs and, in its discretion, decided that it was realistic for the Schofield project. Further, TSI cannot point to any language in the solicitation that mandated more documentation. *Impresa*, 238 F.3d at 1337. And the Army's cost-realism evaluation of TSI's proposal contains identical language that its proposals were "determined" to be realistic. *See* AR 3808–14.

Still, TSI insists that the Army's cost-realism analysis was unreasonable because it ignored the fact that costs with five of Westech's nonexempt labor positions were unknown. Yet as addressed above, the Army was not required to reject the proposal on that basis. Also, Westech provided the costs for those five positions in its cost proposal, AR 3296, and the Army decided that those costs were realistic, AR 3790.

TSI also argues that the Army abused its discretion by not finding each specific task's cost to be "realistic." TSI argues that because the Army found that certain rates were unsupported and capped them, the Army was required to affirmatively determine that those rates were realistic. Further, according to TSI, because the Army capped the rates and determined they were unsupported, it had to perform a risk analysis given that Westech would face a loss on the contract.

22

TSI is incorrect.  First, the Army did decide that each cost element was realistic.  Throughout the cost-realism report and during the SSA selection process, the Army considered the proposed rates to be realistic.  *See* AR 3790, 3794–95, 3801, 3828.  Second, TSI is incorrect that the Army did not find the capped rates realistic.  To the contrary, the Army and the SSA found that the proposed rates—which included the capped rates—were realistic.  AR 3791, 3796–98, 3801, 3828.  As the cost-realism report stated: "the recommendation of the capped rates is determined to be realistic for the work to be performed; reflect[s] a clear understanding of the requirements; and the proposed cost elements are consistent with the methods of performance described in the technical proposal."  AR 3801.

In addition, TSI is mistaken that the Army had to perform a risk assessment.    The solicitation's plain language shows that the recommendation of a capped rate is not tantamount to a finding of unrealism.  To be sure, Section M.5.3.2 "cautioned" offerors "that the Government has concerns with the potential for post-award performance problems" if offerors "proposed unrealistically low costs."  AR 132.  In that same section, the Army reserved the option of rejecting a proposal if it found the costs to be unrealistically low.  *Id.*  But what Section M.5.3.2 did not do was warn that unrealistic costs would be capped.  Instead, the solicitation cabined the discussion of caps to Section M.5.3.3.  There, the solicitation specified that if offerors' proposals included unsupported rates, then the Army would cap any unsupported rates.  *Id.*  Thus, TSI's insistence that the Army had to perform a risk analysis stems from a misreading of the solicitation.  The Army reserved the right to reject a proposal in Section M.5.3.2 if the Army decided that the proposed costs were unrealistic.  Separate from the cost-realism discussion in Section M.5.3.2, Section M.5.3.3 provided an admonition that the Army would cap unsupported rates.  In other words, the Army identified separate potential issues—unsupported rates versus unrealistic costs—and provided separate solutions to each—capping rates versus rejecting a proposal.

TSI tries to muddy the distinction by arguing that this court's decision in *VS2, LLC v. United States*, 155 Fed. Cl. 738 (2021) should guide the outcome here.  There, the Army found that a bidder had proposed labor rates "not in compliance" with the solicitation and "failed to explain" how it would make up the difference.  *Id.* at 747.  In response to the Army's evaluation notice, the bidder capped its own rates.  *Id.* at 748.  Unimpressed, the Army's cost-realism analysis concluded that the capped rates were unrealistic and awarded the contract to VS2.  *Id.*  GAO reversed the Army's decision.  *Id.* at

749.  This court, in turn, reversed GAO because GAO erred by interfering with the Army's discretion.  *Id.*  For when "an agency determines that an offeror's proposed or estimated cost is unrealistically low, an agency may not only make an upward 'most probable cost' adjustment" "but also may determine that the offeror's proposal represents an unacceptable risk of performance."  *Id.* at 759.  Put differently, when "an agency determines that an offeror's proposed costs are unrealistically low for the contemplated performance, the agency must account for that assessment in at least two ways: the agency must consider whether to adjust the proposed costs upwards for the evaluation purposes, and it must consider whether the proposed costs are indicative of performance risk."  *Id.* at 762.  TSI reasons that, because the Army capped Westech's and SA-Tech's proposed rates, it also needed to perform a risk assessment.

*VS2* is inapposite.  This case is distinct precisely because the Army in *VS2* affirmatively decided that the bidder's proposed costs were unrealistic.  *Id.* at 748.  It is that determination of unrealism that triggers the requirement under FAR to perform a risk assessment.  *See id.* at 762.  Here, the Army did not determine that any of Westech's or SA-Tech's rates were unrealistic— indeed, it concluded that the capped rates were realistic.  AR 3801.  *VS2*'s logic does not apply.

As a last resort, TSI cites the GAO decision in *MCT JV*, but that situation is similarly distinguishable.  In *MCT JV*, GAO reversed the Navy's award of a ship refurbishment contract because the Navy did not analyze the risk posed by the awardee's "low capped indirect rates on its ability to perform under the contract."  *MCT JV*, B-311245.2, B-311245.4, 2008 WL 29070333, at *15 (Comp. Gen. May 16, 2008).  Yet in *MCT JV*, the Navy found—even after the awardee capped its own rates—that the awardee's proposal still posed a fiscal risk to the government.  *Id.* at *7.  The Navy, because of its concerns about the awardee's fiscal state, commissioned an independent audit of the awardee, which found that the cap would merely exacerbate the awardee's preexisting financial problems and would affect its ability to perform under the contract.  *Id.* at *11.

No such facts are present here.  The Army did not have any concerns that the capped rates would undermine Westech's performance; to the contrary, it found that the capped rates were realistic.  AR 3801.  And unlike in *MCT JV*, the Army did not commission an audit of Westech to probe its financial solvency.  Thus, just like *VS2*, *MCT JV* is inapplicable because it

involved a situation in which the agency had explicit reservations about an offeror's ability to perform financially. The Army had none here.

Finally, TSI provides several pages of calculations, drawn from Westech's data on its historical and proposed rates, to conclude that Westech will perform at a loss on the Schofield contract. *See* TSI MJAR 34–37. TSI warns that Westech will face "a contract loss for the entire period of performance of the Task Order of $96,035." TSI MJAR 36. The Army's failure to account for that loss, TSI reasons, renders its cost-realism analysis arbitrary and capricious. TSI is wrong. Even if its calculations are correct, all TSI has shown is that Westech will lose $96,035 on a contract worth over $91,000,000. Put another way, Westech's alleged losses will amount to roughly one tenth of one percent of the contract's value. Such an insignificant loss provides no basis to disturb the Army's conclusion that Westech's proposed costs are realistic.

CONCLUSION

Because TSI has failed to show that the Army's decision was arbitrary or capricious on the merits, we need not probe the question of prejudice nor the issue of injunctive relief. *See Onésimus Def., LLC v. United States*, No. 24-867, 2024 WL 4315115, at *12 (Fed. Cl. Sept. 16, 2024). Accordingly, TSI's motion for judgment on the administrative record is denied. The United States' and Westech's cross-motions for judgment on the administrative record are granted. The Clerk of Court is directed to enter judgment accordingly. No costs.

s/Eric G. Bruggink
ERIC G. BRUGGINK
Senior Judge